# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                                             No. CR 16-0281 JB

JORGE HERNANDEZ,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Petition for Revocation of Supervised Release, filed July 9, 2018 (Doc. 47). The Court held an evidentiary revocation hearing on January 29, 2019. See Draft Transcript of Hearing, taken January 29, 2019 ("Tr.").[1] The primary issue is whether the Court should revoke Defendant Jorge Hernandez' supervised release, because he violated a condition of his supervised release by committing a federal, state, or local crime by: (i) striking Brianna Angulo; (ii) intentionally setting fire to a kitchen; (iii) taking items without paying for them from a Shell gas station; and (iv) driving rapidly while weaving through traffic and crossing into oncoming traffic while evading police in a manner that caused at least one vehicle accident and nearly caused another accident with a police vehicle. The Court concludes by a preponderance of the evidence that Hernandez drove above the speed limit while weaving through traffic, crossing into oncoming traffic, evading police and nearly crashing into a police vehicle. The Court, thus, concludes by a preponderance of the evidence that Hernandez violated N.M. Stat. Ann. § 30-22-22, Aggravated Assault upon a Peace Officer (Deadly Weapon); N.M. Stat. Ann. § 30-22-1.1, Aggravated Fleeing a Law Enforcement Officer;

---

[1]The Court's citations to the transcripts of both hearings refer to the court reporter's original, unedited version; any final transcripts may contain slightly different page and/or line numbers.

N.M. Stat. Ann. §66-8-113, Reckless Driving; and multiple traffic laws, including driving through a red light, traveling on the wrong side of the road, and speeding. The Court concludes that the evidence is insufficient to support determinations that Hernandez: (i) struck Brianna Angulo; (ii) intentionally set fire to a kitchen; (iii) took items without paying for them from a Shell gas station; and (iv) caused an accident. Accordingly, the Court will revoke Hernandez' supervised release.

## PROCEDURAL BACKGROUND

On November 22, 2016, Hernandez was sentenced to thirty months imprisonment and three years of supervised release, subject to several special conditions. See Clerk's Minutes for Proceedings at 1, filed November 22, 2016 (Doc. 42). The Court entered Final Judgment, filed December 7, 2016 (Doc. 45). While Hernandez was on supervised release, the Court issued an arrest warrant for Hernandez. See Arrest Warrant, filed July 11, 2018 (Doc. 49).

1. **Amended Petition for Warrant.**

The United States Probation Office ("USPO") filed an Amended Petition for Warrant on September 28, 2018 (Doc. 55)("Amended Petition"). In the Amended Petition, the USPO alleged that Hernandez had violated a condition of his supervised release: "You must not commit another federal, state, or local crime." Amended Petition at 1. The USPO listed the ways in which Hernandez had violated this condition. First, Hernandez was arrested on July 4, 2018, for Battery (Household Member.) See Amended Petition at 1. The Amended Petition alleges that he struck his girlfriend's eye with a closed fist. Second, Hernandez was arrested on July 4, 2018, for Criminal Damage to Property (Household Member; over $1,000). The USPO alleges that Hernandez was "setting a fire on the stove top and was using paper towels and other items" and

that the kitchen table was "flipped over and broken." Amended Petition at 2. Third, Hernandez was arrested on July 4, 2018, for Arson ($250 or Less in Damage). The USPO alleges that Hernandez' girlfriend, Brianna Angulo told police she saw smoke at the residence. <u>See</u> Amended Petition at 2. Upon entering the residence, the officers smelled smoke. <u>See</u> Amended Petition at 2. Upon entering the residence's kitchen, the officers saw Hernandez using paper towels and other items to set a fire on top of the stove. <u>See</u> Amended Petition at 2. On a July 9, 2018, telephone call with the USPO, Hernandez said that he started the fire to commit suicide. <u>See</u> Amended Petition 2. The USPO told Hernandez to report to the USPO within an hour, which Hernandez did not do. <u>See</u> Amended Petition at 2.

Next, on July 16, 2018, Hernandez was arrested for Aggravated Assault Upon a Peace Officer (Deadly Weapon). <u>See</u> Amended Petition at 2. The USPO alleges that Rio Rancho police officers responded to a dispatch that stated that a male, Hernandez, had shoplifted items from a Shell gas station. <u>See</u> Amended Petition at 2. One of those officers parked on the side of the road to await the shoplifter, and Hernandez' car nearly crashed into the officer's car. <u>See</u> Amended Petition at 2. Hernandez then fled from the officer and was arrested three days later. <u>See</u> Amended Petition at 2. Next, Hernandez was arrested on July 16, 2018, for Aggravated Fleeing a Law Enforcement Officer on July 13, 2018. <u>See</u> Amended Petition at 2. The USPO alleges that Hernandez fled a police officer while driving at "a high rate of speed, swerving in and out of both lanes of travel crossing the double yellow lines in the roadway." Amended Petition at 2. Next, Hernandez was arrested on July 16, 2018, for Shoplifting (over $250 but not more than $500) on July 13, 2018, at a Shell gas station. <u>See</u> Amended Petition at 2. Next,

Hernandez was arrested on July 16, 2018, for Reckless Driving; Leaving the Scene of an Accident; and several traffic violations on July 13, 2018. See Amended Petition at 2.

The USPO advises that, because Hernandez' underlying crime is a Class C felony, the maximum statutory penalty is two years imprisonment and three years supervised release. See Amended Petition at 3. The USPO states that, because Hernandez has a Criminal History Category of VI and committed Grade B violations of his supervised release condition, the revocation range of imprisonment is between twenty-one and twenty-seven months. See Amended Petition at 3.

## 2. **Hearing.**

The Court held an evidentiary hearing on January 28, 2019. See Tr. at 1:22 (Butcher). The United States introduced Jacob Hopkins, a Rio Rancho police officer, and stated that Hopkins would be acting "as a case agent of sorts today." See Tr. 2:5-10 (Hurtado). The USPO told the Court that the violations of supervised release at issue did not make revocation mandatory. See Tr. at 5:24-6:2 (Court, Villalobos). Hernandez pled not guilty to all charges. See Tr. 9:5-7 (Butcher). The United States first called Katrina Villalobos, a United States Probation Officer, to testify as a witness. See Tr. 9:22-10:18 (Hurtado, Court, Villalobos). The United States next called Hopkins, who was at the scene of the alleged arson and battery, to testify as a witness. See Tr. 18:14-18:22 (Hurtado, Court, Hopkins). The United States next called Ingram[2], a Rio Rancho Police patrol officer who was at the scene of the alleged reckless driving and shoplifting, to testify as a witness. See Tr. 35:16-37:5 (Hurtado, Court, Ingram).

_____

[2]The draft transcript of the hearing does not provide Ingram's given name.

The United States next called Hickerson,[3] a Rio Rancho police officer who was at the scene of the alleged reckless driving, aggravated assault of a peace officer, and aggravated fleeing from a peace officer, to testify as a witness. Tr. at 48:21-50:16 (Hurtado, Court, Hickerson). Neither party called any further witnesses. <u>See</u> Tr. at 59:3-8 (Hurtado, Court, Butcher). The Court concluded that Hernandez had "violated supervision," Tr. at 68:11 (Court), and gave a sentence, in accordance with the "guideline range," of twenty-one months imprisonment and twelve months supervised release, Tr. 74:23 (Court). <u>See</u> Tr. 74:17-77:1 (Court).

## <u>FINDINGS OF FACT</u>

The Court held an evidentiary hearing on the revocation of supervised release. The Court makes the following findings of fact related to the issues. Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. <u>See</u> Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for rule 12(d) purposes. In making its findings, the Court does not consider any evidence or testimony from the hearing that violates the <u>United States v. Jones</u> test. <u>See</u> <u>United States v. Jones</u>, 818 F.3d 1091, 1099 (10th Cir. 2016).

---

[3]The draft transcript of the hearing does not provide Ingram's given name.

1. **Background.**

1. On July 13, 2016, Hernandez entered a plea agreement in which he pled guilty to possessing a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1). See Plea Agreement, filed July 13, 2016 (Doc. 34).

2. The Court sentenced Hernandez to thirty months imprisonment with three years of supervised release and with the mandatory condition that Hernandez "must not commit another federal, state, or local crime" on supervised release. Judgment in a Criminal Case at 2-3, filed December 7, 2016 (Doc. 45).

2. **July 4, 2018, Domestic Events.**

3. Hopkins has worked as a police officer with the Rio Rancho Police Department for around four years, and he previously had served as a police officer with the Sandoval County Sheriff's Office for around three years. See Tr. at 18:24-19:4 (Hopkins).

4. Around 3:45 a.m., on July 4, 2018, Hopkins was on duty in the City of Rio Rancho. See Tr. at 19:8-10 (Hopkins, Hurtado).

5. Hopkins received a call about a domestic disturbance at 146 Prado Verde Court, Rio Rancho. See Tr. at 19:12-14 (Hopkins); id. at 20:7-11 (Hopkins).

6. Maria Hernandez, Hernandez' sister, had also been at the residence at the time. See Tr. at 32:20-21 (Hopkins).

7. Angulo's face displayed bruises and swelling on the left side. See Tr. at 22:23-25 (Hopkins); Picture of Angulo at 1 (sent November 21, 2018).

8. When Hopkins arrived at the house, Angulo was standing outside the house, appeared distressed, see Tr. at 22:2-5 (Hopkins), and urged Hopkins and the officer

accompanying him to enter the house, because Hernandez was "attempting to set [the] house on fire," Tr. at 22:7 (Hopkins).  See id. at 22:6-7 (Hopkins).

9.     Hopkins approached and then entered the home with Officer Anthony Tortorici. See Tr. at 25:13-14 (Hopkins).

10.    Hopkins and Tortorici stopped at the front door to inform whoever was inside that the officers were Rio Rancho police officers and to ask the location of any individual inside.  See Tr. at 25:15-21 (Hopkins).

11.    Hopkins and Tortorici received no response.  See Tr. at 25:21-22 (Hopkins).

12.    When at the "threshold of the front door," Tr. at 25:23 (Hopkins), Hopkins smelled "a strong odor of . . . natural gas" and heard a smoke detector sounding, Tr. at 25:24 (Hopkins).  See Tr. at 25:21-26:2 (Hopkins).

13.    Hernandez was "attempting to light the stove on fire with paper towels and chemical agents on top of the gas stove."  Tr. at 14-16 (Hopkins).

14.    The stove's natural gas, the residence's back wall, paper towels, and other objects were burning.  See Tr. at 33:16-23 (Hopkins, Hurtado).

15.    When Hopkins and Tortorici approached Hernandez, Hernandez appeared agitated.  See Tr. at 26:19-20 (Hopkins).

16.    Hernandez kept one hand behind his back throughout his confrontation with Hopkins and Tortorici.  See Tr. at 26:20-27:1 (Hopkins).

17.    Hernandez continued to move the stove's knobs and to add additional chemical agents to the stove after Hopkins and Tortorici reached the kitchen.  See Tr. at 2 7:1-3 (Hopkins).

18.     Hernandez threatened, in a "hostile and aggressive" manner, to kill Hopkins and Tortorici.  Tr. at 27:12 (Hopkins).  See id. at 27:5-12 (Hopkins, Hurtado).

19.     Hopkins and Tortorici eventually subdued Hernandez and removed him from the house in handcuffs.  See Tr. at 28:17-18 (Hopkins); id. at 28:21-24 (Hopkins).

20.     Hernandez damaged the kitchen table and other objects within the house when he threw items from the home's kitchen table and counters.  See Tr. at 31:14-18 (Hopkins).

**3.     July 9, 2018, USPO Interaction.**

21.     On July 9, 2018, Hernandez notified probation that the Rio Rancho Police Department had arrested him on July 4, 2018.  See Tr. at 13:5-6 (Villalobos):

22.     The USPO instructed Hernandez to report to the probation office.  See Tr. at 15:1-2 (Villalobos).

23.     Hernandez did not report to the probation office on July 9, 2018, as instructed. See Tr. at 17:24-18:2 (Villalobos).

**4.     July 13, 2018, Shoplifting.**

24.     On July 13, 2018, at the Shell gas station at Northern Road and Loma Colorado Boulevard in Rio Rancho, see Tr. at Tr. at 37:3-4 (Ingram), a "Hispanic male in his [30s] approximately with tattoos up his neck, and glasses," Tr. at 41:2-4 (Ingram), brought alcohol, water, and energy drinks to the counter, see Tr. at 41:5-6 (Ingram).

25.     The Shell gas station clerk bagged the cigarette cartons.  See Tr. at 41:17-18 (Ingram).

26.     The man took the bagged items and left the store.  See Tr. at 41:17-21 (Ingram, Hurtado).

27.     A surveillance video captured the events.  See Tr. at 41:22-42: (Hurtado, Ingram).

28.     Officer Ingram identified the man in the surveillance video as Hernandez.  See Tr. at 43:9-15 (Hurtado, Ingram).

29.     After the man left the Shell gas station, the Rio Rancho Police Department ran the New Mexico license plate number of the man's vehicle and identified Hernandez as the vehicle's owner.  See Tr. at 52:13-16 (Hickerson).

30.     Officer Ingram has been a patrol officer for the Rio Rancho Police Department for two years.  See Tr. at 35:24-36: 5 (Hurtado, Hopkins).

31.     On July 13, 2018, Ingram was looking for traffic violations around Idalia Road and Loma Colorado Boulevard in Rio Rancho.  See Tr. at 36:12-13 (Ingram).

32.     Ingram drove west on Idalia Road and was sitting at the intersection of Idalia Road and Broadmoor Boulevard, see Tr. at 37:6-10 (Ingram), when a white Ford sport utility vehicle ("SUV") ran "a red light heading northbound on [Broadmoor Boulevard]," Tr. at 37:13-16 (Ingram).

33.     Ingram attempted to catch the Ford SUV.  See Tr. at 37:24-25 (Ingram).

34.     The Ford SUV drove "at a high rate of [speed]," Tr. at 38:1 (Ingram), which exceeded the speed of other vehicles, including a speed limit van,[4] and wove "in and out of traffic," Tr. at 38:1-2 (Ingram).

35.     The weaving took the Ford SUV into oncoming traffic.  See Tr. at 38:2 (Ingram).

_____

[4]The speed limit van does not display a vehicle's speed but photographs speeding vehicles.  See Tr. at 38:10-13 (Ingram).

36.     Cars around the Ford SUV moved to the side of the road and swerved to avoid colliding with the Ford SUV.  See Tr. at 38:24-39:3 (Ingram).

37.     The Ford SUV had a New Mexico license plate numbered "543 WFX."  See Tr. at 39:19-20 (Ingram).

38.     That license plate number of the Ford SUV matched the number of a vehicle that departed the Shell gas station, and the vehicle was registered to Hernandez.  See Tr. at 39:23-40:3 (Ingram); id. at 52:13-16 (Hickerson).

39.     Officer Hickerson has worked for the City for the Rio Rancho Police Department for seven years.  See Tr. at 49:2-6 (Hurtado, Hickerson).

40.     On July 13, 2018, Hickerson was on duty in Rio Rancho, and drove toward the intersection of Northern Boulevard and Unser Boulevard.  See Tr. at 49:3-16 (Hurtado, Hickerson).

41.     Hickerson received notification that a four-door SUV was driving southbound on Unser Boulevard and, after Hickerson stopped his vehicle on Northern Boulevard, he observed the SUV driving down Unser Boulevard.  See Tr. at 50:11-16 (Hickerson).

42.     The SUV crossed to Northern Boulevard and was driving westbound.  See Tr. at 51:1 (Hickerson).

43.     As the SUV approached Hickerson, the SUV crossed the double yellow line into Hickerson's eastbound lane into "a collision course with" Hickerson.  Tr. at 51:7-8 (Hickerson).  See Tr. at 51:3-8 (Hickerson).

44.     The SUV reentered his lane, and Hickerson started his siren and lights, and "attempted to catch" the SUV.  Tr. at 51:11-12 (Hickerson).  See Tr. at 51:8-12 (Hickerson).

45.     Hickerson identified the SUV's driver as Hernandez.   See Tr. at 52:8-12 (Hickerson); id. at 54:13-15 (Hurtado, Hickerson); id. at 54:22-55:1 (Hurtado, Hickerson).

46.     The Rio Rancho Police Department cancelled the chase because of safety concerns, see Tr. at 51:11-14 (Hickerson), because Hickerson observed the driver, and because the Rio Rancho Police Department identified the license plate number and to whom it was registered, see Tr. at 52:15-19 (Hickerson).

## RELEVANT LAW REGARDING THE GUIDELINES

In United States v. Booker, the Supreme Court of the United States severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making the Guidelines sentencing ranges effectively advisory.  In excising the two sections, the Supreme Court left the remainder of the Sentencing Reform Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.  Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."  United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary," to comply with the four statutorily defined purposes that 18 U.S.C. § 3553(a)(2) enumerates:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551(a). To achieve these purposes, § 3553(a) directs sentencing courts to consider:

(i) United States Sentencing Guidelines Manual (U.S. Sentencing Comm'n 2018)("U.S.S.G." or "Guidelines"); (ii) the nature of the offense and of the defendant's character; (iii) the available sentences; (iv) the policy favoring uniformity in sentences for defendants who commit similar crimes; (v) the need to provide restitution to victims; and (vi) any pertinent United States Sentencing Commission policy statements in effect on the date of sentencing. See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the United States Court of Appeals for the Tenth Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to careful consideration. See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many"), overruled on other grounds by Gall v. United States, 552 U.S. 35 (2007). The Guidelines are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] 'represent at this point eighteen years' worth of careful consideration of

the proper sentence for federal offenses.'"  United States v. Cage, 451 F.3d at 593 (quoting

United States v. Terrell, 445 F.3d 1261, 1265 (10th Cir. 2006), overruled on other grounds by

Rita v. United States, 551 U.S. at 349).  A reasonable sentence is one that "avoid[s] unwarranted

sentence disparities among defendants with similar records who have been found guilty of

similar conduct."  18 U.S.C. § 3553(a)(6).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within

the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d

at 1264.  This presumption, however, is an appellate presumption, and not one that the trial court

can or should apply.  See Kimbrough v. United States, 552 U.S. 85, 90-91 (2007); Gall v. United

States, 552 U.S. at 46-47; Rita v. United States, 551 U.S. at 350-51 (repeating that the

presumption of reasonableness "is an *appellate* court presumption" (emphasis in original);

United States v. Conlan, 500 F.3d 1167, 1169-70 (10th Cir. 2007)(stating that "the government

rightly concedes the district court erred in affording a presumption of reasonableness to the

recommended advisory sentence," because "the guideless are presumptively reasonable only at

the appellate level").  Instead, the trial court must undertake the § 3553(a) balancing of factors

without any presumption in favor of the advisory[5] Guidelines sentence.  See Kimbrough v.

_____

[5]Attorneys and courts often say that the "Guidelines" are advisory, Gall v. United States, 552 U.S. at 46 ("As a result of our decision [in United States v. Booker, 543 U.S. 220 (2005)], the Guidelines are now advisory . . . ."); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory."), but it appears more appropriate to say that the resulting Guidelines ranges are advisory.  The Court must consider the Guidelines, see Gall v. United States, 552 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately

calculate the Guidelines range, see Gall v. United States, 552 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."). The Court is not mandated, however, to apply a sentence within the calculated Guidelines range. See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-*Booker* have discretion to assign sentences outside of the Guidelines-authorized range . . . ."). Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

       The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e). . . . .

       The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted). In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield. In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances." Irizarry v. United States, 553 U.S. 708, 710-16 (2008). A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

United States, 552 U.S. at 90-91; Gall v. United States, 552 U.S. at 46-47; Rita v. United States, 551 U.S. at 351.

> While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence. Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.). The Supreme Court has recognized, however, that sentencing judges are "'in a superior position to find facts and judge their import under § 3553(a)' in each particular case." Kimbrough v. United States, 552 U.S. at 89 (quoting Gall v. United States, 552 U.S. at 51).

## LAW REGARDING REVOCATION AND REVOCATION HEARINGS

Subsection (e)(3) of § 3583 permits courts to revoke supervised release on the conclusion that the defendant violated a condition of probation by a preponderance of the evidence. See 18 U.S.C. § 3583(e). Section 3583(e)(3) sets forth the process for revoking supervised release:

> **(e)** **Modification of conditions or revocation.** -- The court may, after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7) --
> . . . .
> (3) revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release without credit for time previously served on postrelease supervision, if the

United States v. Nolf, 30 F. Supp. 3d 1200, 1222-24 (D.N.M. June 20, 2014)(Browning, J.).

court, pursuant to the Federal Rules of Criminal Procedure
applicable to revocation of probation or supervised release,
finds by a preponderance of the evidence that the defendant
violated a condition of supervised release, except that a
defendant whose term is revoked under this paragraph may
not be required to serve on any such revocation more than 5
years in prison if the offense that resulted in the term of
supervised release is a class A felony, more than 3 years in
prison if such offense is a class B felony, more than 2 years
in prison if such offense is a class C or D felony, or more
than one year in any other case . . . .

18 U.S.C. § 3583(e)(bold in original). "Preponderance of the evidence" means:

The greater weight of the evidence, not necessarily established by the
greater number of witnesses testifying to a fact but by evidence that has the most
convincing force; superior evidentiary weight that, though not sufficient to free
the mind wholly from all reasonable doubt, is still sufficient to incline a fair and
impartial mind to one side of the issue rather than the other.

"Preponderance of the Evidence," Black's Law Dictionary (10th ed. 2014).

"The Sixth Amendment [to the Constitution of the United States of America] is a trial

right and does not apply to pretrial proceedings." United States v. Hernandez, 778 F. Supp. 2d

1211, 1225 (D.N.M. 2011)(Browning, J.). The Tenth Circuit has suggested that the Sixth

Amendment applies only to trial proceedings. See United States v. Bustamante, 454 F.3d 1200,

1202 (10th Cir. 2006). But rule 32.1 of the Federal Rules of Criminal Procedure gives the

defendant at the revocation hearing "an opportunity to appear, present evidence, and question

any adverse witness unless the court determines that the interest of justice does not require the

witness to appear." Fed. R. Crim. P. 32.1(b)(2)(c). The rule's notes instruct courts to apply a

balancing test that weighs "the person's interest in the constitutionally guaranteed right to

confrontation against the government's good cause for denying it." Rule 32.1 Advisory

Committee's Note to the 2012 Amendment. The Tenth Circuit has adopted the balancing test

"when determining a releasee's confrontation rights at a revocation hearing." United States v. Jones, 818 F.3d at 1099.

## ANALYSIS

The Court concludes that Hernandez violated multiple state laws. Hernandez needed to violate only one federal, state, or local offense for the Court to revoke supervised release. See 18 U.S.C. § 3583(e); U.S.S.G. § 7B1.1 (classifying federal, state, or local offense violations, and describing separately how a court should calculate the violations "where there is more than one violation of the conditions of supervision"). The Court, therefore, is authorized to revoke his supervised release.

**I.   THE COURT CANNOT CONSIDER TESTIMONY OF ANGULO, THE ABSENT RIO RANCHO POLICE OFFICER, OR MARIA HERNANDEZ AND, THEREFORE, DOES NOT FIND BY A PREPONDERANCE OF THE EVIDENCE THAT HERNANDEZ COMMITTED ASSAULT, ARSON, OR DAMAGE TO PROPERTY OF A HOUSEHOLD MEMBER.**

At the hearing, the United States presented evidence that Angulo provided to Hopkins, see Tr. at 31:21-22 (Hopkins); id. at 29:4-8 (Hopkins), that a Rio Rancho Police Department officer conveyed to other officers, see Tr. at 21:9-14 (Hopkins); id. at 21:21-22 (Hopkins); and that M. Hernandez provided to Hopkins, see Tr. at 35:1-5 (Hopkins, Hurtardo). The Court concludes that, under the United States v. Jones balancing test, it cannot consider this testimony. See 818 F.3d at 1098.

Rule 32.1(b)(2)(C) of the Federal Rules of Criminal Procedure requires the Court to apply a balancing test to determine whether it may consider hearsay evidence for revocation

purposes. See Fed. R. Crim. P. 32(1)(b)(2)(C); United States v. Jones, 818 F.3d at 1098. When applying the balancing test, the Court must weigh the defendant's interest in cross-examining and confronting the witness with the government's good cause for not presenting the witness. See United States v. Jones, 818 F.3d at 1098 (citing Rule 32.1's Advisory Committee Note to the 2002 Amendment). First, Hernandez, like any defendant, has an interest in confronting individuals testifying against him, and he has an special need to confront Angulo. See United States v. Jones, 818 F.3d at 1099-100. Like the defendant in United States v. Jones, Hernandez has an special need to confront Angulo because of two "textbook bases for cross-examin[ing]": (i)"exploring possible bias," because of her relationship with Hernandez; and (ii) "asking why [Angulo] refused to cooperate in the state" case, "a matter on which the parties and the court could only posit educated guesses without her testimony." United States v. Jones, 818 F.3d at 1101. Moreover, "generally recognized concerns with eyewitness testimony" strengthen Hernandez' interest in confronting Angulo. See United States v. Jones, 818 F.3d at 1101. Second, Hernandez has an interest in confronting the Rio Rancho police officer who conveyed the information from Angulo's call to the responding officers, but the Court concludes that his interest in confronting this police officer is mitigated by the reliability of the Rio Rancho Police Department in calling officers to the scene of the crime and conveying facts about the crime scene to other officers. Such information may raise some reliability concerns, however, because a third party might have given the Rio Rancho Police Department officer information about the incident. Third, Hernandez has an interest in confronting his sister M. Hernandez, who described Hernandez' alleged assault of Angulo to the responding officers. M. Hernandez' familial

relationship with Hernandez heightens her potential bias. Hernandez, thus, has an interest in confronting Angulo, the Rio Rancho police officer, and M. Hernandez.

The United States does not demonstrate good cause for not presenting Angulo that is sufficient to outweigh Hernandez' interest in confronting her. At the hearing, the United States was silent as to Angulo's absence. The United States mentioned that she had moved to California and was refusing to cooperate in the state battery case, but that information supports only speculation. See United States v. Jones, 818 F.3d at 1101 (concluding that the United States had not demonstrated good cause when the information they provided allowed the Court only "to posit educated guesses without her testimony"). The Court, accordingly, concludes that Hernandez' need to confront Angulo outweighs the United States' good cause for her absence.

The United States does not demonstrate good cause for not presenting the Rio Rancho Police Department officer or M. Hernandez. The United States has not given any reason to explain the Rio Rancho Police Department officer's absence or M. Hernandez' absence. Cf. United States v. Jones, 818 F.3d at 1102 (concluding that fear of retaliation did not adequately explain a witness' absence where the United States did not ask or subpoena the witness to attend). The Court, accordingly, concludes that Hernandez' need to confront the dispatching officer outweighs the United States' good cause for the Rio Rancho Police Department dispatching officer's absence. Because the Court concludes that Angulo's, the Rio Rancho Police Department officer's, and M. Hernandez' statements do not satisfy the United States v. Jones' test, the Court should not consider that evidence.

Because the Court excludes this evidence, the Court only can consider Angulo's photograph in determining whether Hernandez committed assault. While the photograph

demonstrates injuries to Angulo's face, the Court cannot say, without more, that it is more probable than not that Hernandez caused these injuries. The Court, accordingly, does not find by a preponderance of the evidence that Hernandez assaulted Angulo. Moreover, the Court has no evidence that it could consider in determining to whom the house and the property belonged. The Court, accordingly, does not find by a preponderance of the evidence that Hernandez committed arson or damaged the property of a household member.

## II.    THE COURT CANNOT CONSIDER THE TESTIMONY OF THE SHELL GAS STATION CLERK AND THE MISSING RIO RANCHO POLICE DEPARTMENT OFFICER AND, THEREFORE, DOES NOT FIND BY A PREPONDERANCE OF THE EVIDENCE THAT HERNANDEZ SHOPLIFTED.

At the hearing, the United States presented evidence that the Shell gas station clerk provided to Ingram, see Tr. at 42:2-18 (Ingram), and that a Rio Rancho Police Department officer conveyed to other officers, see Tr. at 46:25-47:8 (Hurtado, Ingram); id. at 47:14-1525 (Ingram). The Court concludes that, under the United States v. Jones' balancing test, it cannot consider this testimony. First, Hernandez, like any defendant, has an interest in confronting individuals giving information against him, although here the individuals' reliability suggests that Hernandez does not have a strong need to confront them. See United States v. Jones, 818 F.3d at 1099-100. The Court sees little reason to doubt the reliability of a gas station clerk who observed and reported a shoplifting at close quarters, particularly when the gas station clerk knew that a surveillance video recorded the events that she reported. The Court similarly accepts that information from a Rio Rancho Police Department officer reporting a crime is generally reliable. Such information may raise some reliability concerns, however, because a third party might have given the Rio Rancho Police Department officer information about the accident.

Hernandez, thus, has an interest in confronting the Rio Rancho Police Department officer and a weaker interest in confronting the gas station clerk.

Second, the United States has not shown good cause for not presenting the gas station clerk and the Rio Rancho Police Department officer at the revocation hearing. The United States has named no reasons at all why the gas station clerk and the Rio Rancho Police Department officer did not appear in the courtroom for Hernandez to confront. The Court, accordingly, concludes that the United States has not shown "good cause for denying," Rule 32.1 advisory committee's note, the defendant's "interest in the constitutionally guaranteed right to confrontation," Rule 32.1 advisory committee's note. Cf. United States v. Henry, 852 F.3d 1204, 1208 (10th Cir. 2017)(explaining that a district court cannot conclude the "interest of justice" provides reason to deny the defendant's confrontation right without engaging in the balancing test).

As the Court cannot conclude that the gas station clerk's and Rio Rancho Police Department officer's statements satisfy the United States v. Jones' test, the Court will not consider that evidence. The Court, accordingly, cannot determine soundly by a preponderance of the evidence that Hernandez took items from the Shell gas station without purchasing the items, or that Hernandez' driving caused a vehicle accident involving Rebecca Baca and Louis Baca. See Tr. at 47:14-15 (Ingram). The United States presented only the Rio Rancho Police Department officer's out-of-court testimony to show that a vehicle accident occurred. See Tr. at 46:25-47:8 (Hurtado, Ingram); id. at 47:14-1525 (Ingram). The Court, therefore, has no evidence that the accident occurred. The United States presented the gas station clerk's account, see Tr. at 42:2-18 (Ingram), and a surveillance video of the events in the Shell gas station.

See Tr. at 42:2-6 (Hurtado, Ingram).  The Court cannot determine without the gas station clerk's statements that Hernandez did not pay for the merchandise.  The surveillance video shows Hernandez swiping his credit card, and the gas station clerk's statements are necessary to clarify that, at that time, Hernandez did not pay for the merchandise.

III. **THE COURT FINDS BY A PREPONDERANCE OF THE EVIDENCE THAT HERNANDEZ VIOLATED HIS SUPERVISED RELEASE CONDITIONS BY COMMITTING RECKLESS DRIVING.**

The Court concludes that a preponderance of the evidence demonstrates that Hernandez violated N.M. Stat. Ann. § 66-8-113, Reckless Driving.  N.M. Stat. Ann. § 66-8-113 provides:

> Any person who drives any vehicle carelessly and heedlessly in willful or wanton disregard of the rights or safety of others and without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger any person or property is guilty of reckless driving.

N.M. Stat. Ann. § 66-8-113.    First, the Court examines whether Hernandez was driving "carelessly and heedlessly" as to indicate "willful or wanton disregard of the rights or safety or others."  N.M. Stat. Ann. § 66-8-113.  Hernandez sped and abruptly changed lanes in a heavily trafficked area.  See Tr. at 57:22-24 (Butcher, Hickerson); id. 51 at 15-16 (Hickerson).  That he drove in this manner in an area with a lot of traffic demonstrates a wanton disregard of the safety of others.  See Tr. at 38:22 (Hickerson)(stating "absolutely" in response to whether Hernandez' driving posed a danger to other motorists).  This wanton disregard manifested in a near-collision with Hickerson's vehicle.

Second, the Court examines whether Hernandez was driving "at a speed or in a manner so as to endanger or be likely to endanger any person or property."  N.M. Stat. Ann. § 66-8-113. Although speeding does not, on its own, demonstrate reckless driving, see State v. Clemonts,

2006-NMCA-031, ¶ 16, 139 N.M. 147, 130 P.3d 208, speed can establish recklessness "if the speeding created a danger for others and additional conduct establishes that a driver willfully disregarded the safety of others," State v. Munoz, 2014-NMCA-101, ¶ 10, 336 P.3d 424, 426 (citing State v. Simpson, 1993-NMSC-073, 867 P.2d 1150).  Hickerson identified the driver of the vehicle as Hernandez.  See Tr. at 52:8-12 (Hickerson); id. at 54:13-15 (Hurtado, Hickerson); id. at 54:22-55:1 (Hurtado, Hickerson).   Hickerson confirmed that the vehicle was moving at a "high rate of speed."  Tr. at 57:22-24 (Butcher, Hickerson). While Hernandez' speed alone is insufficient to find him guilty for reckless driving, Hernandez had engaged in additional conduct that demonstrates his recklessness.  Hickerson testified that Hernandez' vehicle crossed over the double-yellow line into the lane in which Hickerson was driving.  See Tr. at 51:3-8 (Hickerson). Hickerson described Hernandez' trajectory as "a collision course" with Hickerson's vehicle.  Tr. at 51:7-8 (Hickerson).   Moreover, Hernandez was driving in an area with "quite a bit of traffic" at the time, which factored into the Rio Rancho police's decision to stop Hickerson's pursuit of Hernandez.  Tr. at 51:15-16 (Hickerson).  See Tr. at 51:13-19 (Hickerson, Hurtado).   Hernandez endangered at least Hickerson, with whom he nearly collided.   The Court, thus, concludes that a preponderance of the evidence supports that Hernandez violated N.M. Stat. Ann. § 66-8-113.

IV.     **THE COURT FINDS BY A PREPONDERANCE OF THE EVIDENCE THAT HERNANDEZ VIOLATED HIS SUPERVISED RELEASE CONDITIONS BY FLEEING A LAW ENFORCEMENT OFFICER.**

Next, the Court concludes that Hernandez violated N.M. Stat. Ann. § 30-22-1.1, Aggravated Fleeing a Law Enforcement Officer:

A.      Aggravated fleeing a law enforcement officer consists of a person willfully and carelessly driving his vehicle in a manner that endangers the life of another person after being given a visual or audible signal to stop, whether by

> hand, voice, emergency light, flashing light, siren or other signal, by a uniformed
> law enforcement officer in an appropriately marked law enforcement vehicle in
> pursuit in accordance with the provisions of the Law Enforcement Safe Pursuit
> Act.

N.M. Stat. Ann. § 30-22-1.1.  The Court first must determine whether Hickerson was acting as a

"uniformed law enforcement officer in an appropriately marked law enforcement vehicle" in

accordance with the statute.  N.M. Stat. Ann. § 30-22-1.1.  Hickerson testified that he was

driving a "fully marked vehicle" at the time, Tr. at 56:10 (Hickerson), equipped with, at the very

least, sirens, see Tr. at 51:11 (Hickerson);  id. at 49:15-16 (Hickerson)(describing his vehicle as

"a fully marked police K-9 vehicle").  Hickerson stated that he was dressed in his "full uniform

displaying [his] badge."  Tr. at 49:15-16.  See  State v. Montano, 2018-NMCA-047, ¶ 27, 423

P.3d 1, 11, cert. granted (July 24, 2018)("Section 30-22-1.1(A), however, requires that an officer

be both 'uniformed' *and* in 'an appropriately marked law enforcement vehicle.'")(quoting N.M.

Stat. Ann § 30-22-1.1(A)).  The Court, therefore, concludes that Hickerson was acting as a

"uniformed law enforcement officer in an appropriately marked law enforcement vehicle"

pursuant to N.M. Stat. Ann § 30-22-1.1(A).

The Court must determine whether Hickerson gave Hernandez a "visual or audible signal

to stop" in accordance with N.M. Stat. Ann § 30-22-1.1(A).  Hickerson testified that,

immediately following his near-collision with Hernandez, Hickerson "engaged" his "sirens."  Tr.

at 51:10-11 (Hickerson).  Hickerson stated that he "believe[d]" that he activated his "emergency

equipment, [his] sirens, [his] lights," during the pursuit.  Tr. 55 at 11-16 (Butcher, Hickerson).

Sirens from a marked police car suffice as notice to the driver to stop the vehicle.  See State v.

Montano, 2018-NMCA-047, ¶ 45, 423 P.3d at 16 (concluding that an appropriately marked

vehicle need "only a siren, an emergency light *or* a flashing light" to meet the signal requirement under N.M. Stat. Ann § 30-22-1.1(A))(emphasis in original). The Court concludes that Hickerson gave Hernandez both a visual and an audible signal to stop driving.

Finally, the Court must determine whether Hernandez continued to drive recklessly after Hickerson signaled for Hernandez to stop driving. Hickerson testified that, after signaling Hernandez, he pursued Hernandez. See Tr. at 55:15-16 (Hickerson). Hickerson needed to turn his vehicle around to pursue Hernandez. See Tr. at 55:14. Because of the speed at which Hernandez was driving, however, Hernandez was "pretty [] far ahead of" Hickerson by the time Hickerson turned his car around. Tr. at 56:6 (Hickerson). Hickerson's testimony suggests that he stopped pursuing Hernandez in part because Hernandez' speed on the trafficked roads led to the "pursuit [being] canceled due to the safety of it." Tr. at 55:10 (Hickerson). The Court, therefore, concludes that Hernandez' high-speed driving on busy roads after being signaled to stop demonstrate that Hernandez violated N.M. Stat. Ann § 30-22-1.1(A)).

## V. THE COURT FINDS BY A PREPONDERANCE OF THE EVIDENCE THAT HERNANDEZ VIOLATED HIS SUPERVISED RELEASE CONDITIONS BY FLEEING A LAW ENFORCEMENT OFFICER.

Next, the Court concludes by a preponderance of the evidence that Hernandez violated N.M. Stat. Ann. § 30-22-1.1, Aggravated Fleeing a Law Enforcement Officer, by nearly crashing his car into Hickerson's parked police vehicle. Aggravated assault upon a peace officer is defined as "unlawfully assaulting or striking a peace officer with a deadly weapon while he is in the lawful discharge of his duties." N.M. Stat. Ann. § 30-22-1.1. First, the Court assesses whether Hickerson could be considered "in lawful discharge of his duties" at the time of the near-collision. N.M. Stat. Ann. § 30-22-1.1. The standard for determining whether a police

officer is in lawful discharge of his duties is subjective, as long as "the conduct is not such that a [sic] objectively reasonably officer would not consider it to be unlawful." State v. Tapia, 2000-NMCA-054, ¶ 30, 129 N.M. 209, 215. The Court looks to whether Hickerson was acting within the scope of his duties or was engaging in frolic at the time of the assault. See State v. Tapia, 2000-NMCA-054, ¶ 30, 129 N.M. at 215. Hickerson stated that, at the time of the near-collision, he had parked on the side of the road so he could search for the white Ford SUV. See Tr. at 50:4-8 (Hickerson). Hickerson's testimony demonstrates that he was discharging duties within the scope of his employment at the time of the incident.

Next, the Court concludes that Hernandez had knowledge of whether Hickerson was a peace officer at the time of the near-collision. To commit aggravated assault upon a peace officer, scienter is required. See Reese v. State, 1987-NMSC-079, ¶ 6 P.2d 1146, 1147, on reh'g, 1987-NMSC-110, ¶ 6, 745 P.2d 1153. Hernandez had knowledge that Hickerson was a police officer because Hickerson was parked in a "fully marked" police vehicle and wearing his police uniform at the time of the near-collision. See Tr. at 56:10 (Hickerson). Therefore, Hernandez had the knowledge required to commit aggravated assault upon a peace office.

Finally, the Court concludes that nearly hitting a police officer with a car qualifies as aggravated assault. The Court of Appeals of New Mexico concluded that a defendant who nearly drove his car into a police officer could be convicted for aggravated assault upon a peace officer under N.M. Stat. Ann. § 30-22-22. See State v. Trujillo, No. CR 29-762, 2010 WL 4019947, at *3 (N.M. Ct. App. Mar. 17, 2010). When the Court finds by a preponderance of the evidence, as it does here, that Hernandez nearly hit an occupied police car with his car, it can

also find by a preponderance of the evidence that Hernandez nearly hit a police officer with his car.

Because the Court has concluded that Hernandez has violated his supervisory release by committing three serious crimes, the Court revokes his supervisory release. The underlying crime is a Class C felony. See Amended Petition at 3; 18 U.S.C. § 3583(e)(3). The Court, therefore, is authorized to impose imprisonment of up to twenty-four months. See 18 U.S.C. § 3583(e)(3); Amended Petition at 3. Hernandez violated his supervised release's terms by committing Grade B felonies. See Amended Petition at 3. Because he had a Criminal History Category of VI and committed Grade B felonies, the recommended range of imprisonment upon revocation is twenty-one months to twenty-seven months. See U.S.S.G. § 7B1.4. The Court believes that these crimes are serious and could have resulted in the death of multiple individuals. See Tr. at 74:13 (Court)(describing the violations as "serious [in] nature"). Although Hernandez asked the Court to sentence him below the Guideline range, see Tr. at 69:24-25 (Butcher), the Court cannot have defendants on supervised release committing crimes in the community, particularly crimes that potentially could hurt people, such as law enforcement officers. Obeying the law while on supervised release is one of, if not the, most important responsibilities of defendants on supervised release. While not all § 3553(a) factors are relevant to revocation of supervised release, protecting the public remains a relevant factor for the Court to consider. In this case, the Court, therefore, concludes that a sentence of twenty-one months is appropriate.

**IT IS ORDERED** that the Court revokes Jorge Hernandez's supervised release and sentences him to twenty-one months of imprisonment and twelve months of supervised release.

_____
UNITED STATES DISTRICT JUDGE

     *Counsel*:

John C. Anderson
  United States Attorney
Samuel A. Hurtado
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

John Van Butcher
  Assistant Federal Public Defender
Federal Public Defenders' Office
Albuquerque, New Mexico

*Attorney for the Defendant*